## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ORACLE NEWNAN 2018 GP, LLC AND ORACLE CONSULTING SERVICES, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| TAX CREDIT HOLDINGS - ORACLE NEWNAN 2018, L.L.C.; AFFORDABLE EQUITY PARTNERS, INC.; AND BEAR HOLDINGS, L.L.C. D/B/A JES HOLDINGS, LLC; | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. _____

## <u>COMPLAINT</u>

Plaintiffs, Oracle Newnan 2018 GP, LLC ("**Oracle Newnan GP**" or the "**General Partner**") and Oracle Consulting Services, LLC (the "**Developer**"), by and through their undersigned attorneys, as and for their Complaint against Defendants, Tax Credit Holdings - Oracle Newnan 2018, L.L.C. ("**TCH**"), Affordable Equity Partners, Inc. ("**AEP**"), and Bear Holdings, L.L.C. d/b/a JES Holdings, LLC ("**JES**" and, together with TCH and AEP, "**Defendants**"), allege as follows:

## INTRODUCTION

1.      This case relates to a line of troubling cases that have emerged around the country in recent years concerning attempts to take advantage of, and usurp economic benefits intended for, general partner developers of affordable housing developed under the federal government's Low-Income Housing Tax Credit ("**LIHTC**") program, 26 U.S.C. §42 ("**Section 42**").

2.      Oracle Newnan GP is the general partner of Oracle Newnan 2018, LP (the "**Partnership**"), which is a Georgia limited partnership that owns and manages a 96-unit affordable multi-family apartment complex known as "McIntosh Woods" in Newnan, Georgia ("**Apartment Complex**") that was developed under the LIHTC program.

3.      As general partner, Oracle Newnan GP has the right to manage the Partnership and Apartment Complex pursuant to the terms of a Second Amended and Restated Limited Partnership Agreement Dated as of August 27, 2021 ("**LPA**"). A true and correct copy of the LPA is attached hereto as **Exhibit A**.   In exchange for its services, the General Partner's principal benefit is certain economic benefits under the LPA, including the right to receive a substantial portion of the Partnership's cash flow and proceeds from a sale or refinance of the Apartment Complex.

4.      Relatedly, the Developer, an affiliate of the General Partner, is responsible for the development of the Apartment Complex pursuant to an Amended and Restated Development Agreement, dated August 27, 2021, which is attached as Exhibit E to the LPA (the "**Development Agreement**").  In exchange for its services, the Developer is entitled to be paid a Development Fee.

5.      Defendant TCH is the Partnership's Investment Limited Partner ("**ILP**"), Georgia Limited Partner ("**GLP**"), and Special Limited Partner ("**SLP**") (collectively, the "**Limited Partners**").  As such, TCH has no management rights and possesses only certain, limited consent rights. But, in exchange for its investment of equity to be contributed to the Partnership under the LPA, TCH is entitled to passively collect from the Partnership substantial tax benefits, including, but not limited to, valuable tax credits made available under the LIHTC program ("**Housing Credits**").

6.      However, consistent with the troubling trend in the LIHTC industry where certain groups utilize a "now-nationally-familiar pattern of tactics" seeking to improperly seize more benefits from LIHTC partnerships than were bargained for, *JER Hudson GP XXI LLC v. DLE Invs., LP* ["**JER**"], 275 A.3d 755, 761, 771-77 (Del. Ch. 2022), TCH seeks to do exactly that here through the collusive action of its various affiliates, AEP, Fairway Construction Co., Inc. ("**FWC**"), and JES.

7.    Namely, after insisting that the Partnership hire FWC as general contractor to construct the Apartment Complex and needlessly causing the Partnership to incur substantially inflated construction costs paid to FWC, TCH, under the control of AEP and JES, has continually and wrongly blamed the General Partner for FWC's ineptitude as general contractor and for FWC's consequent delays and unnecessary costs in the construction of the Apartment Complex. Moreover, TCH has sought to use that misguided blame-shifting as justification for: (i) the Partnership's continued utilization of, and payments to, FWC, including through the invalid use of change orders that have the knock-on effect of eroding Plaintiffs' economic rights; (ii) TCH's further wrongful attempts to erode Plaintiffs' economic rights under the LPA by, for example, seeking to reduce the amount of equity that TCH must contribute to the Partnership (in turn, causing the payment of Developer's Development Fee to be deferred indefinitely, if ever paid) and construe its required equity contributions under the LPA as alleged interest-bearing loans to the Partnership that must be repaid to TCH before the Plaintiffs receive any economic benefits from the Partnership; (iii) reversing course after approving a pro forma showing partial payment of the Development Fee and verbally committing not to pursue downward adjustments to Housing Credits; and (iv) continually accusing the General Partner of defaulting under the LPA for over a year, but thereafter continuing to benefit from the General Partner's management undertaken on behalf

of the Partnership following such misplaced accusations. Worse still, despite the General Partner repeatedly denying and discrediting these baseless accusations that are, in fact, attributable to Defendants' own actions and inactions, on June 16, 2025, TCH sought to carry out the final act of Defendants' cover-up campaign by purporting to remove the General Partner from the Partnership, declaring TCH's sovereignty over the Partnership, and thereby seeking to capture all of Plaintiffs' economic rights under the LPA and Development Agreement.

8.    Such tactics designed to try to remove a general partner from a LIHTC partnership and thereby seize all of the general partner's and developer's economic rights is part of the "now-nationally-familiar pattern of tactics" used to improperly strip value from affordable housing and deprive general partners, like Oracle Newnan GP, of their just rewards. *See, e.g.*, *JER*, 275 A.3d at 772 & n.78 (citing *CED Capital Holdings 2000 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.* ["***Berkshire II***"], 2020 WL 6537072, at *5-7, *10 (Fla.Cir.Ct. Nov. 03, 2020) (discussing attempt by limited partner to use its refusal to allow a refinance of a maturing loan and "allegations of default [that] were baseless" to remove the general partner from the LIHTC partnership and deprive the general partner of its economic rights)); *CED Capital Holdings X, Ltd. et al. v. CTCW-Waterford East, L.L.C.* ["***Waterford I***"], 2022 WL 1717946, at *1-2, *6-7, *9-10 (Fla. Cir. Ct. May 12, 2022) (rejecting equally "baseless" allegations of default asserted in

"an *identical* default notice based on *identical* grounds of default" in a different LIHTC partnership by a limited partner affiliated with the *Berkshire II* limited partner).

9.      Tellingly, as in *Berkshire II* and *Waterford I*, this case is also not an isolated incident.  Defendants are engaging in virtually identical wrongdoing and asserting virtually identical allegations of default in an entirely separate LIHTC partnership—known as Limestone Trail Apartments, LP (the "**Limestone Partnership**")—in which an affiliate of Oracle Newnan GP also serves as general partner and FWC was also hired to construct its LIHTC property located in Lebanon, Tennessee (the "**Limestone Project**").

10.     Given this existential threat to the governance of the Partnership and Plaintiffs' various rights related thereto, Plaintiffs bring this action seeking, *inter alia*, declaratory, injunctive, and other supplemental relief to arrest Defendants' wrongful actions.

## PARTIES

11.     General Partner is a Georgia limited liability company registered to do business in Georgia with a principal business office at 10401 Covered Bridge Road, Prospect, KY 40059.

12.    Developer is a Kentucky limited liability company registered to do business in Georgia with a principal business office at 10401 Covered Bridge Road, Prospect, KY 40059.

13.    Upon information and belief, TCH is a Missouri limited liability company with a principal business office at 206 Peach Way, Columbia, MO 65203-4905.  TCH is not registered to do business in Georgia.

14.    Upon information and belief, AEP is a Missouri corporation with a principal business office at 206 Peach Way, Columbia, MO 65203-4905.  AEP is registered to do business in Georgia.

15.    Upon information and belief, JES is a Missouri limited liability company with a principal business office at 206 Peach Way, Columbia, MO 65203-4905.  JES is not registered to do business in Georgia.

16.    Upon information and belief, FWC is a Missouri corporation with a principal business office at 206 Peach Way, Columbia, MO 65203-4905.

17.    Upon information and belief, Defendants and FWC are all affiliated through common ownership and control.

18.    As indicated by its website, JES is the parent company of AEP and FWC.  https://jesholdings.com/ (last visited September 4, 2025) (including links to AEP's and FWC's websites); *see also* https://www.aepartners.com/about-us/ (last visited September 4, 2025).

19.    As stated on its website, FWC provides "construction services for JES Holdings, LLC." https://fairwayconstruction.net/about-us/ (last visited September 4, 2025). And, as confirmed by AEP's and FWC's most recent Registration Reports, true and correct copies of which are respectively attached hereto as **Exhibit B** and **Exhibit C**, FWC and AEP have overlapping board of director members and officers.

20.    Upon information and belief, AEP is the direct or indirect owner of, at minimum, the managing interest in TCH and, as such, operates and manages TCH, including in its capacity as the Limited Partners in the Partnership.

21.    Under the LPA, AEP is, *inter alia*, designated as the Limited Partners' "Agent" "for the purpose of reviewing copies of requests for draws under the Bond Loan and Capital Contributions to pay costs of constructing the Apartment Complex," and is entitled to an Asset Management Fee for its services in connection with the Partnership's accounting matters relating to the ILP. (LPA §§ 4.2(e), 11.5; *see also id.* § 9.1(ss) (dubbing TCH and its Affiliates as the "AEP Entities"))

22.    In TCH's Articles of Organization, a true and correct copy of which is attached hereto as **Exhibit D**, AEP is identified as the recipient of TCH's filings with the State of Missouri, and Will Markel—an AEP officer—is identified as its registered agent.

23.    In JES's most recent Registration of Fictitious Name, a true and correct copy of which is attached hereto as **Exhibit E**, AEP is also identified as the recipient

of JES's filings with the State of Missouri, and Will Markel executed the registration on behalf of JES.

24.     Plaintiffs' communications with TCH, AEP, and JES have virtually all been through the same individuals, which have used AEP and JES signature blocks.

25.     Further, Plaintiffs have communicated with FWC through TCH's, AEP's, and JES's representatives.

26.     At all relevant times herein, and upon information and belief, TCH has acted under the direction and control of AEP and JES.

## JURISDICTION, VENUE, AND APPLICABLE LAW

27.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiffs and all Defendants.  Specifically, upon information and belief, Defendants are citizens of the State of Missouri, and no Plaintiff is a citizen of Missouri.

28.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because, as set forth herein, the amount in controversy exceeds $75,000, exclusive of interest and costs.

29.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) because the Partnership's Apartment Complex is located in this District and all or a substantial part of the events or omissions giving rise to the cause of action accrued in this District.

30.     This Court has personal jurisdiction over Defendants because they have made sufficient minimum contacts in the State of Georgia by virtue of, *inter alia*, availing themselves of the benefits and protections of Georgia law and doing business in Georgia through the Partnership.

31.     Pursuant to Section 21.4 of the LPA, the LPA "shall be construed and enforced in accordance with the laws of [Georgia]."  (LPA, § 21.4)

## FACTUAL BACKGROUND

### I.     The LIHTC Program

32.     Because the issues presented in this case "are intertwined with LIHTC—a highly complex, unique federal program—some background into the mechanics of LIHTC is needed."  *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.* ["**Pathway**"], 33 F.4th 872, 873-74 (6th Cir. 2022); *accord JER*, 275 A.3d at 763.

33.     Congress enacted the LIHTC program in 1987 to address the shortage of affordable housing in the United States and benefit low-income individuals.

34.     The key feature of the LIHTC program is the Housing Credit, which provides a valuable dollar-for-dollar tax liability offset, thus incentivizing private investors with large, annual income tax obligations—typically large institutional investors such as U.S. banks, insurance companies, and large corporations—to invest capital in the development of affordable housing.  *See Pathway*, 33 F.4th at

874 (citing H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1188 (1989) (giving "tax incentives to private investors...is the most appropriate way to achieve th[e] aim" of increasing affordable housing)).

35.    Housing Credits are generated from certain multi-unit housing properties that satisfy a number of requirements, including an agreement by the property owner to rent certain units for a statutorily prescribed period of time to households with incomes below certain qualified limits at rents that do not exceed federally-mandated maximums.

36.    Because developers rarely have suitably large, predictable income tax obligations to utilize Housing Credits, the LIHTC program facilitates the "sale" of these Housing Credits to tax-credit investors in exchange for capital needed to develop affordable housing properties. *Low-Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks*, Office of the Comptroller of the Currency ["**Comptroller Report**"], at 3, 23 (March 2014)[1]; Keightley, *An Introduction to the Low-Income Housing Tax Credit*, Congressional Research Service ["**CRS Report RS22389**"], at Summary & 1, 5 (Jan. 26, 2021)[2]; Khadduri *et al.*, *What Happens to Low-income housing Tax Credit Properties at Year 15 and*

---

[1]    *Available    at    https://www.occ.gov/publications-and-resources/publications/community-affairs/community-developments-insights/ca-insights-mar-2014.html*

[2] *Available at* https://sgp.fas.org/crs/misc/RS22389.pdf

*Beyond?*, U.S. Department of Housing and Urban Development ("**HUD**") ["**Year 15 HUD Report**"], at 25 (August 2012)[3].

37.    Generally, in a low-income housing development (a "**property**"), the property owner is organized as a limited partnership or limited liability company (the "**project partnership**"—here, the Partnership), in which a "**project sponsor**" (here, the General Partner) acts as the general partner or managing member of the project partnership and its affiliate acts as the developer of the property.

38.    The project sponsor first obtains an allocation of Housing Credits on behalf of the project partnership by engaging in a complex, "extremely competitive" application process.  Comptroller Report at 24, CRS Report RS22389 at 4; Year 15 HUD Report at 56; *Pathway*, 33 F.4th at 874.

39.    Once the Housing Credits are awarded, the project partnership becomes entitled to collect the Housing Credits over a ten-year period following the property being "placed in service," known as the "**Credit Period**"; however, to secure the Housing Credits from "recapture" by the IRS, the project partnership must comply with complex federal rent restrictions for a concurrently running fifteen-year period, referred to earlier as the "**Compliance Period**."  Comptroller Report at 3, 23; CRS Report RS22389 at 4; Year 15 HUD Report at xiii, 29.

---

[3] *Available at* https://www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf

40.    A tax-credit investor is admitted to the project partnership as a limited partner or limited member based on a carefully negotiated agreement whereby it will make capital contributions to the project partnership specifically in exchange for the allocation of substantially all of the Housing Credits awarded to the project partnership, along with certain other bargained-for benefits. *E.g.*, *JER*, 275 A.3d at 764-65 ("[D]evelopers 'sell' the tax credits to private investors, usually through a syndicator, in exchange for an equity investment in the housing project.").

41.    Because the amount of capital invested is typically based on the amount of Housing Credits and other valuable tax benefits forecasted to be received—not operational cash flow or resale profits (*i.e.*, residual value)—the amount invested as a capital contribution by the tax-credit investor is referred to in the LIHTC industry as the "price" paid for the Housing Credits. Comptroller Report at 23; *see also id.* at 22 ("LIHTC investors receive financial benefits on their investments through the [Housing Credits], as well as the additional deductions from real estate losses."); CRS Report RS22389 at 6 (explaining that rather than looking to cash benefits, "investors look to the credits, which will be used to offset their income tax liabilities, as their return on investment…. The larger the difference between the market price of the credits and their face value ($1.00), the larger the return to investors.…").

42.    Because tax benefits (*i.e.*, Housing Credits and tax losses) flow to partners in a project partnership in accordance with their respective ownership

interest percentages in the project partnership, the tax-credit investor is given 99-percent-plus of the ownership interests in the project partnership, but this does not equate to a 99-percent-plus economic or equity interest in the LIHTC partnership's operational cash flow and sale or refinance proceeds.  Comptroller Report at 3; CRS Report RS22389 at 5; Year 15 HUD Report at 25, 32.

43.    The tax-credit investor assumes only a "passive," restricted role in the management of the property and project partnership.  *AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.* ["**TDC**"], 15 F.4th 551, 553 (1st Cir. 2021) ("large ownership percentage with an otherwise passive role"); *Pathway*, 33 F.4th at 874-75, 881; *JER*, 275 A.3d at 766 ("Institutional investors seeking tax credits invest as limited partners with only a few enumerated consent rights.").

44.    Correspondingly, project sponsors typically hold less than 1 percent of the ownership interests in the project partnership.  However, as the general partner or managing member, they are responsible for the project partnership's operations and the property's development, management, and compliance with the LIHTC program for the life of the property, and in no event less than the fifteen-year Compliance Period.  Year 15 HUD Report at 25; *see also* Comptroller Report at 3, 16; CRS Report RS22389 at 6.

45.    The project sponsor is also asked to assume most of the risk associated with investing in the Housing Credits by providing investors with completion,

operating, and tax delivery guarantees, with an unconditional guarantee of construction completion being most important because an unfinished property cannot produce Housing Credits. Comptroller Report at 17, 24. Such agreements effectively act as "guarantees on investment yields" for the tax credit investor. *Id.*

46.    Frequently, as here, tax-credit investors invest in a project partnership through a tax credit fund (a "**tax credit fund**") (here, TCH), which is itself usually a limited partnership in which one or more tax-credit investors own passive limited partner interests. That tax credit fund often owns numerous limited partner interests in project partnerships, and the benefits received by the tax credit fund from those numerous project partnerships are then distributed to the tax-credit investor(s) at the upper-tier level pursuant to the agreement(s) governing the tax credit fund.

47.    For example, a typical tax credit fund structure is depicted as follows:



Comptroller Report at 4, 17 ("Figure 2 illustrates the typical legal structure for an investment in a syndicated LIHTC equity fund. The syndicator organizes one or more investors and forms an investment fund, and the fund invests in one or more affordable housing properties.  Thus, a two-tier partnership structure is created with funds from investors combining in the upper-tier investment partnership and funds

from pooled equity financing multiple, lower-tier property partnerships. Investors hold 99.99 percent ownership of the investment fund; the syndicator, as general partner or managing member, holds 0.01 percent ownership. . . . The tax credits flow from the lower-tier partnerships to the upper-tier partnership, where investors share the tax credits….").

48.     Upon information and belief, TCH is a tax credit fund that is comprised of one tax-credit investor and owns limited partner/limited member ownership in several project partnerships, including the above-mentioned Limestone Partnership.

49.     Also, often (as here), a special or administrative limited partner (here, also TCH) is admitted to the project partnership.  This special or administrative limited partner is typically also the general partner or managing member of the tax credit fund and owes a fiduciary duty to the tax-credit investor(s) to manage the investment in the project partnership(s) that own the property(ies) and receive(s) the Housing Credits.

50.     This special or administrative limited partner entity (or its interest in the project partnership) is typically owned in whole or in part by what is commonly referred to in the LIHTC industry as a tax-credit "**syndicator**" (here, AEP), which effectively serves as the middleman between project sponsors and tax-credit investors by locating project sponsors who have been awarded an allocation of Housing Credits and negotiating for, and agreeing to thereafter manage for a fee, the

tax-credit investor's investment in the Housing Credits.  Comptroller Report at 17 ("Syndicators often include the underwriting guidelines used for the acquisition of investments in the fund offering documents.  These guidelines may include minimum rates of return, debt coverage ratios, and reserves.  In some cases, syndicators may be required to inform investors of deviations from these guidelines.").

51.    Typically, the syndicator is immediately compensated for its middleman efforts by the one-time markup of the per-dollar "price" paid by its tax credit investors for the Housing Credits awarded to the project partnership.  *See id.*

52.    The special or administrative limited partner usually has little or no ownership stake in the project partnership, contributes a nominal amount for its admission, and its role consists of passively holding the contingent right to become an additional general partner and take over management of the project partnership in the event that the project sponsor's management places at risk the receipt of the Housing Credits due to, for example, the failure to operate in compliance with the Housing Credit rules and/or defaulting under the parties' governing documents.  *Id.* at 22.

53.    At the end of the statutorily prescribed 15-year Compliance Period (commonly referred to as "Year 15"), the tax-credit investor limited partner has collected all Housing Credits and other desired tax benefits, and those benefits are

fully secured from recapture by the IRS. Consequently, tax-credit investors customarily seek to exit the project partnership because "the greatest benefits of ownership" are "both gone and safeguarded," leaving "little economic motivation to stay in the deal"—especially when "tax reporting and other administrative burdens" remain. Year 15 HUD Report, at 25, 29 ("[I]t is in the interest of limited partners (LPs) to end their ownership role quickly after the compliance period ends. They have used up the tax credits by Year 10, and after Year 15 they no longer are at risk of IRS penalties....[A]s a matter of policy, [syndicators and direct investors] work to engineer an investor exit as quickly as possible after [Year 15]."); Comptroller Report at 3 ("Most often, investors exit between year 11 and 16, having collected [the Housing Credits]."); *accord TDC*, 15 F.4th at 553-54 ("At the end of the compliance period, the time may be ripe for the investor to bid farewell....").

54.    To incentivize the project sponsor to facilitate this exit, as well as compensate the project sponsor for its 15 years of services, the tax-credit investor also customarily agrees—pursuant to a "capital transaction" waterfall provision—to give the project sponsor a substantial portion of any residual proceeds generated by a sale or refinance of the property occurring upon its anticipated exit in or around Year 15. *See* Year 15 HUD Report at 25, 44 ("GPs may look to property cash flow as an important source of financial return for their efforts. … A property's operating success can also have an impact on its resale value.").

55.    The right to receive residual proceeds from a sale of the property is often one of the primary economic incentives for the project sponsor in a project partnership.

56.    While the tax-credit investor receives a substantial yearly return on its investment during the Compliance Period in the form of Housing Credits and other tax benefits with virtually no involvement in the project partnership or property, during the Compliance Period the project sponsor and its developer affiliate is obligated to provide development and management services in exchange for a portion of very modest annual cash flow from operations, if any, and what often is a very modest developer fee (especially when netted of costs).  Furthermore, a developer fee may be required to be partially deferred, and this deferred fee only paid if the property generates sufficient cash flow or capital transaction proceeds to pay them.  Moreover, as noted, the project sponsor and developer affiliate assume significant financial risk during the Compliance Period.

57.    The project sponsor and developer affiliate undertake this investment of time, resources, and money, and assume these significant duties and risk, with the expectation that they will have the ability to generate economic benefits through cash flow, developer fees, and the eventual sale or refinance of the property.

58.    Conversely, the tax-credit investor often does not expect, nor project, any material cash payments in connection with their investment in the project

partnership.  Instead, as HUD has documented, the LIHTC industry has evolved to the point that tax-credit investors expect "little or no residual value or return of capital."  Year 15 HUD Report at 76 ("[A]s investor competition to purchase LIHTC equity intensified, 'back-end' [i.e., end-of-Compliance Period] dynamics moved decidedly in favor of [project sponsors].  The industry has evolved to the point that benefits offered to investors now often include little or no residual value or return of capital.").

59.    The "little or no residual value or return of capital" to tax-credit investors acknowledged by HUD has also been recognized and allowed by the IRS because, by Year 15, investors have already received the predictable, materially beneficial return on investment through Housing Credits and other tax benefits that Congress intended.

60.    For example, the IRS has promulgated 26 C.F.R. § 1.42-4, a regulation that expressly excepts Housing Credits from section 183 of the Internal Revenue Code ("section 183"), which disallows tax deductions and tax credits when an individual or entity subject to pass-through taxation engages in activity with no intent to profit but instead only to mitigate tax obligations.  In the preamble to this regulation, the IRS stated:

> Although no explicit reference is contained in section 42 or its legislative history regarding its interaction with section 183, the legislative history of the [Housing Credit] indicates that Congress contemplated that tax benefits such as the credit and depreciation would

be available to taxpayers investing in low-income housing, even though such an investment would not otherwise provide a potential for economic return. Therefore, to reflect the congressional intent in enacting section 42, the regulatory authority under section 42(n) is being exercised to provide that section 183 will not be used to limit or disallow the credit.

T.D. 8420 (57 F.R. 24749-24750) (Jun. 11 1992).

61.    Courts around the country have also repeatedly recognized that tax-credit investors in LIHTC partnerships invest primarily for Housing Credits and other tax benefits, not real estate value (like what TCH is now attempting to seize from the General Partner through its alleged loans, removal scheme, and other wrongful conduct). *See, e.g.*, *Pathway*, 33 F.4th at 874, 881 (noting the tax "benefits alone provide the investor with a significant return on investment that makes the arrangement attractive and worthwhile" and that the purpose of a typical LIHTC partnership is "for [the investor] to reap the benefits from the housing tax credits, not from the Property's long-term appreciation gains," as "evinced by the fact that [the investor limited partner's] role in the Partnership was meant to be entirely passive"); *JER*, 275 A.3d at 766 ("Section 42 advances the deliberate policy choice to replace a typical equity investor's expectations of economic cash flow or appreciation from the apartment complex with a comparable or better return on investment almost solely derived from tax benefits." (quoting *Opa-Locka Cmty. Dev. Corp. v. HK Aswan, Inc.*, 2020 WL 4381624, at *3 (Fla. Cir. Ct. July 7, 2020), *aff'd sub nom.*, 2021 WL 4190914 (Fla. Dist. Ct. App. Sept. 15, 2021)); *see also*

Year 15 HUD Report at 24, 82 (noting "reduced expectations of cash flow and resale potential" is "inherent in the design of the LIHTC program" and "the [Housing Credit] compensates investors" for this).

62.    As the Sixth Circuit Court of Appeals has recognized, these carefully negotiated economic sharing arrangements are "crucial to the efficacy of the LIHTC program" in that they allow project sponsors to refinance the property and utilize the appreciated equity for which they bargained to make needed repairs and continue operating the housing for its low-income residents in good condition after the tax-credit investor's exit, and/or invest in the creation of new affordable housing properties through continued participation in the LIHTC program, which hinges upon continued project sponsor participation. *See Pathway*, 33 F.4th at 875; *see also* Comptroller Report at 14 ("[L]imited partners should factor into their establishment of the exit price the general partner's need to maintain the requisite restricted rents…."); Year 15 HUD Report at 30 (same); *Waterford I*, 2022 WL 1717946, at *2 (noting tactics aimed at "forc[ing] a buyout of [limited partner] interests…at a higher price" can place "partnerships and their residents at risk").

63.    It is thus well-documented that participation in the LIHTC program results in the formation of a unique public-private partnership, governed by unique, carefully negotiated contracts that alter the typical bargained-for exchange in conventional real-estate business ventures. *E.g.*, Zaner, *The low-income housing tax*

*credit*, National Real Estate Investor (April 1, 1996)[4] ("Investors are not looking at these [LIHTC] properties to generate traditional real estate benefits in the same way as conventional multifamily investments – it's not the cash flow they're looking at - but the ability to reduce their federal tax liability.").

64.     Here, Plaintiffs invested in, and took considerable risk from, the Partnership based on these same understandings and expectations.

65.     Without the right to receive material economic benefits from cash flow, developer fees, and/or capital transaction proceeds, Plaintiffs would have little incentive to participate in, and would not have participated in, the Partnership and would be deprived of the economic rights that the parties originally negotiated and agreed to as a condition of TCH's admission into the Partnership.

66.     Upon information and belief, TCH—and the tax-credit investor(s) invested therein—also invested in the Partnership based on these same understandings and expectations.

67.     Indeed, "industry participants in the LIHTC program have long acted in accordance with th[e] understanding" that it is common for tax-credit investor partners to exit project partnerships through an efficient and orderly process that serves to preserve the housing and allow for the real estate appreciation that has built up over fifteen years to remain with the project partnership, the general partner

---

[4] *Available at* https://www.nreionline.com/mag/low-incomehousing-tax-credit

sponsor, and the community and low-income residents served by the housing.  *See Pathway*, 33 F.4th at 875.

## II.    The Emergence of Aggregators and Those Adopting Their Now-Nationally-Familiar Pattern of Tactics

68.    However, as has been well-documented nationwide by state housing agencies and federal and state courts, a growing list of entities—"[s]ome…[who] are taking advantage of the investor interests they already hold in LIHTC projects, while others have been acquiring investor interests in LIHTC partnerships *en masse*," "dubbed 'aggregators,'"—have advanced a predatory business model whereby they engage in a "now-nationally-familiar pattern of tactics" seeking to strip value from affordable housing and seize contractual benefits not bargained for under the original parties' agreements nor intended by Congress.  Washington State Housing Finance Commission ("WSHFC"), *Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, at 1 (September 2019) ("WSHFC Report")[5]; *JER*, 275 A.3d at 755 (discussing, in a 100-page "precedential opinion," the "now-nationally-familiar pattern of tactics" and the "growing body of law" concerning such tactics).

69.    The "public's particular interest" in these Aggregator tactics and their detrimental impact on affordable housing nationwide has also been "well-

---

[5]    *Available at* https://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf

documented" across the country. *Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.* ["**St. Mary's**"], 2023 WL 2698061, at *2 (E.D.N.Y. 2023) (collecting authorities, *e.g.*, *Notice of Funding Availability: March/April 2021*, Massachusetts Dep't of Housing and Community Develop.[6] (indicating that, to obtain a Housing Credit allocation, an "investor cannot have been involved in any 'aggregator' activity, in Massachusetts  or in other states")); *see also The Landing, L.L.C., et al. v. MG Affordable Master, et al.*, 2024 WL 3770334, at *2, n.3 (S.D. Ala. Aug. 12, 2024) (describing "an 'Aggregator'"), *rep. and rec. adopted*, 2024 WL 4289892 (S.D. Ala. Sept. 25, 2024); *Proposed Aggregators Amendment for 2025 LIHTC QAP*, Tennessee Housing Development Agency (Oct. 10, 2024)[7] (recognizing "a spate of lawsuits across the country, with one right here in Tennessee", that serve "to undermine the long-term affordability of Housing Credit Developments…"; and proposing "revisions to the 2025 QAP [Qualified Allocation Plan] to protect [its] partners" who participate in the LIHTC program from "Aggregators"); *New Hampshire Qualified Allocation Plan*, New Hampshire Housing, at 13-14 (June 17, 2025) ("Year 15 Investor Exit and Aggregators").[8]

---

[6]    *Available    at*    https://www.mass.gov/doc/nofa-rental-housing-rapid-production-initiative/download

[7] *Available at* https://thda.org/rental-housing-partners/multi-family-developers/lihc-program.

[8]    *Available    at*    https://www.nhhfa.org/wp-content/uploads/2025/04/2025-2026-Qualified-Allocation-Plan_Amended-June-2025.pdf.

70.    In fact, to date, *at least 32* housing agencies have implemented policies aimed at stopping the now-nationally-familiar pattern of tactics implemented by Aggregators and those like them who have adopted their arguments and playbook, like TCH is doing now by and through the direction and control of AEP and JES. *See, e.g.*, Thakur, Moha, *NHT Offers Toolkit to Help Housing Agencies Strengthen Right of First Refusal*, NATIONAL HOUSING TRUST (Updated Mar. 2023);[9] *accord* Hawai'i Stand. Com. Rep. No. 4064, 31st Leg., Reg. Sess., H.C.R. No. 108 (Haw. April 25, 2022) (resolution urging Hawaii housing agency to combat "some predatory" and "[m]anipulative investors");15 Pedro, Danielle M., *Public-Private Partnerships, LIHTC, and the Preservation of Public Housing: A Case Study of Palolo Valley Homes*, ASIAN-PACIFIC LAW & POLICY JOURNAL, Vol. 25:1:2023 (2023).

71.    In general, Aggregators and those acting like them deploy "burdensome tactics that take advantage of legal ambiguities, resource disparities, and economies of scale," and they push "unsupported positions" designed to extract economic benefits not provided for by the parties' contracts.  WSHFC Report at 1, 5-6; *Berkshire II*, 2020 WL 6537072, at *5-6, 10 (finding such actions and "motivations were in bad faith and in direct conflict with the [original investor's] financial

---

[9]  *Available at*,  https://nationalhousingtrust.org/news/nht-offers-toolkit-help-housing-agencies-strengthen-right-first-refusal-provisions-promoting.

expectations and entitlements" and concluding: "this type of activity has become more common in the LIHTC industry and the Court's decision here is in accord with decisions from other, similar cases in different jurisdictions where parties, like Hunt [the Aggregator], have come into LIHTC partnership agreements and attempted to extract value or proceeds that is not otherwise permitted under the operative contracts like the Partnership Agreement here" (collecting cases evidencing the "Aggregator's playbook")).

72.     More specifically, and as noted above, these tactics frequently include, as here, impeding the general partner's ability to properly manage the partnership and property, and other "bad faith" attempts to manufacture baseless allegations of default to remove the general partner from the LIHTC partnership and thereby allow the limited partner to seize the general partner's and developer's economic benefits for itself. *See Berkshire II*, 2020 WL 6537072, at *5-7, 10; *accord Waterford I*, 2022 WL 1717946, at *1-2, 6-7, 9-10.

73.     As further evidenced by this lawsuit, this Aggregator trend has only continued to "intensif[y]" in recent years. *CED Capital Holdings X, Ltd., et al. v. CTCW-Waterford East, L.L.C.*, 2023 WL 3436906, at *11 (Fla. Cir. Ct. May 8, 2023).

## III.   The Partnership and LPA

74.     The General Partner formed the Partnership in February 2018.

75.    On August 27, 2021, the General Partner reorganized the Partnership to permit TCH's admission contingent upon its execution of the LPA.

### A.    The Housing Credit and Tax Benefits Provisions

76.    Consistent with the well-settled structure of a LIHTC project partnership, the LPA confirms that, after TCH's initial $10.00 capital contribution to the Partnership in connection with its admission, its capital contribution installments to the Partnership are made specifically in exchange for 99.98% of the anticipated Housing Credits and other tax benefits it will receive in accordance with its ownership interest percentage, as well as 100% of the "**Georgia Tax Credit**" in accordance with its 1% ownership interest in the Partnership as the GLP.  (*See, e.g.*, LPA § 4.2(a)-(b); *see also id.* at § 14.1 (providing that all profits, losses, and Housing Credits, other than those arising from a sale or refinance of the Apartment Complex, be allocated 99.98% to the ILP); *id.* at § 14.2 ("Georgia Tax Credits shall be allocated [100%] to the [GLP]."); *id.* at p.6 (defining "Certified Credit" as "(99.98%) of the annual Tax Credits that the Accountants certify in writing to the Partnership that the [ILP] will be able to claim during each full Fiscal Year during the Credit Period"; also defining "Certified Georgia Credits"))

77.    Accordingly, if the ILP receives more Housing Credits from the Partnership than projected, its capital contribution requirements are increased; or, if

the ILP receives less or delayed Housing Credits due to no fault of its own, its capital contribution requirements are decreased.  (*See* LPA § 4.2(d)-(e))

78.    Moreover, if the General Partner fails to satisfy certain timing requirements and conditions necessary to receive Housing Credits when expected, then the General Partner could be forced to "repurchase" the ILP's 99.98% ownership interest if the ILP elects.  (*See* LPA § 6.1(a))  The ILP did not elect to do so here.

79.    Further consistent with the typical bargained-for exchange in a LIHTC partnership, Plaintiffs were asked to guarantee, among other things, the completion of construction, the payment of development deficits, and the funding of operating deficits.  (*See* LPA §§ 8.1-8.2; *see also id.* at Ex. E to LPA (Guaranty Agreement) at § E)

80.    Plaintiffs also agreed to make certain Housing Credit shortfall payments, if needed.  (*See* LPA § 8.3).

81.    Except for any valid Housing Credit shortfall payments or any repurchase obligation, the Limited Partners agreed they would not be entitled to withdraw or demand a return of their capital contributions.  (*See* LPA § 4.8)

82.    Additionally, only if the General Partner failed to "substantially compl[y]" with a "material provision" of the LPA and did not cure such failure after 30 days' notice from the ILP could the Limited Partners withhold the payment of

capital contribution installments.  (*See* LPA § 4.9)  And, if the General Partner cures any alleged default justifying the withholding of capital contributions, the Limited Partners are required to make the capital contribution "promptly."  (*Id.*)

83.    The ILP and GLP's capital contributions are divided into four installments (each, an "**Installment**"), each of which have their own "**Funding Conditions**."  (Ex. C to LPA)

84.    One Funding Condition that applies to the payment of each Installment is that "there is no event of default by the General Partner under the [LPA]."  (*Id.* at § 1)

85.    Put differently, the ILP and GLP's funding of each Installment constitutes an acknowledgment that there is no event of default by the General Partner under the LPA.

86.    The LPA does not allow the ILP or GLP to make partial capital contribution Installments.

87.    Once the Funding Conditions for an Installment are satisfied, the LPA requires the ILP and GLP to make the entire Installment.

88.    The LPA requires that each Installment must be paid to the Partnership, and the use of such funds thereafter is subject to the exclusive control of Oracle Newnan GP as the general partner of the Partnership.

89.    The LPA does not authorize the ILP or GLP to satisfy its capital contribution Installments, in whole or part, by sending such funds directly to FWC or any other person.

**B.    Plaintiffs' Rights and Obligations**

90.    Consistent with the typical LIHTC project partnership, the General Partner was granted the sole and exclusive right to manage the Partnership, subject only to certain TCH consent rights.  (*See, e.g.*, LPA, §§ 7.1, 11.1)

91.    As relevant here, TCH's consent rights apply to any amendments to the FWC Contract, "including without limitation any change orders[.]"  (*See id.* at §§ 7.3(a)(xi), 9.1(l))  Pursuant to Section 7.3 of the LPA, the failure to comply with this consent right would constitute an event of default that would allow TCH to remove Oracle Newnan GP as the Partnership's general partner.

92.    ILP consent is also required to change the Apartment Complex's management company ("**Property Manager**"), which is currently Fairway Management, Inc ("**FWM**").  (LPA § 17.2)

93.    In exchange for the General Partner's services, and despite only owning a 0.01% ownership interest in the Partnership, the Limited Partners agreed that the General Partner is entitled to receive, *inter alia*: (1) up to 75% of any cash flow available from Apartment Complex's annual operations ("**Cash Flow**") after the payment of other priorities, (LPA § 15.1(a)(vii)-(viii)); and (2) up to 75% of any

proceeds from a sale or refinance of the Apartment Complex ("**Cash from Capital Transaction**") after the payment of other priorities, (LPA § 15.1(b)(vi)).

94.    Additionally, the Limited Partners agreed that the General Partner is entitled to a non-cumulative Annual Partnership Management Fee of up to $50,000 annually to the extent Cash Flow is available to pay such fee.  (*See* LPA, §7.9(b))

95.    Moreover, the Limited Partners agreed that the Developer is entitled to a development fee in the amount of $2,453,382.00 (the "**Development Fee**"), paid according to the schedule identified at Section 3 to the Development Agreement, including more than 65%—*i.e.*, $1,599,363.00—due to be paid at the time the ILP makes the Fourth Installment.  (LPA § 7.9(a); Ex. E to LPA (ARDA) at § 3(a))

96.    Any unpaid portion of the Development Fee becomes a "**Deferred Development Fee**" (or "**DDF**") owed by the Partnership at no interest and payable only insofar as there is sufficient funds to pay that fee.  (*See* LPA at p.8; *id.* at § 7.9(a); Ex. E to LPA (Development Agreement) at § 3(a))

97.    To the extent funds do not become available to pay all of the Deferred Development Fee by a certain date, the General Partner is required to make a capital contribution to the Partnership to pay that fee to its developer affiliate.  (*See id.*, §§ 4.1(c), 15.1(a)(iii), (b)(iv); *see also* Exhibit B to LPA (Project Information Fact Sheet; reflecting a Deferred Development Fee of $31,723 as a "Source" to pay the $2,453,382 Development Fee))

98.     Under the Development Agreement, the $2,421,659 non-deferred portion of the Development Fee ("**Non-Deferred Development Fee**") was to be paid as part of the ILP's capital contribution Installments.  Specifically, Section 3(a) of the Development Agreement provides:

> (i) $31,723.00 of the Development Fee shall be paid solely from the Net Cash Flow of the Partnership available pursuant to Section 15.1(a)(iii), from proceeds of a Capital Transaction or from a sale or refinancing pursuant to Section 15.1(b)(iv), and from proceeds of the dissolution and liquidation of the Partnership pursuant to Section 18.2(b)(ii)(C) of the Partnership Agreement (the "Deferred Development Fee"); (ii) $125,169.00 of the Development Fee shall be paid at the time the [ILP] makes the First Installment; (iii) $125,000.00 of the Development Fee shall be paid at the time the [ILP] makes the Second Installment; (iii) $572,127.00 of the Development Fee shall be paid at the time the [ILP] makes the Third Installment; and (iv) … $1,599,363.00 of the Development Fee shall be paid at the time the [ILP] makes the Fourth Installment.

99.     The LPA establishes that the Deferred Development Fee was to be only $31,723.00.  That did not occur here.  Instead, as discussed below, Defendants wrongfully caused, and refused to allow, no more than $250,338 of the Non-Deferred Development Fee to be paid when due.

100.   Section 3(d)-(e) of the Development Agreement sets an outside date of August 27, 2024, for the payment of the Non-Deferred Development Fee to the extent earned and accrued, with the Development Fee being earned proportionate to the percentage of construction completed and the entire Non-Deferred Development

Fee being deemed earned upon issuance of certificates of occupancy for all Apartment Complex buildings.

101.   Pursuant to Section 5 of the Development Agreement, the Partnership is only allowed to withhold Development Fee payments if one of the Plaintiffs has not substantially complied with the Development Agreement or LPA, and the Partnership must promptly release such withheld payments when any alleged default justifying the withholding is cured.

102.   The Partnership's obligation to pay the Development Fee is only discharged if the General Partner withdraws or is validly removed from the Partnership prior to the Apartment Complex being placed in service, neither of which occurred here.

103.   As relevant here, if the Limited Partners *validly* make loans to the Partnership ("**LP Loans**"), the repayment of such LP Loans, with compound interest, comes first in priority over all of Plaintiffs' various rights to payment, including Deferred Development Fees, Annual Partnership Management Fees, Cash Flow, and Cash From Capital Transactions.  (*See* LPA §§ 5.2, 15.1, 15.2)

104.   Additionally, in general, *valid* LP Loans exceeding ("**Excess LP Loans**") the amount of any General Partner loans ("**GP Loans**") made to the Partnership can operate to reduce Plaintiffs' entitlement to payment of, *inter alia*, Cash Flow, Cash From Capital Transactions, and Deferred Development Fees

insofar as the General Partner does not make additional GP Loans to cause the repayment of the Excess LP Loans, with interest ("**Cure Payments**"), within six months of the Excess LP Loans being made.  (*See id.*, § 5.7)

105.   Once a GP Loan is made, the General Partner is only entitled to repayment thereof to the extent there are sufficient funds from Cash Flow, Cash From Capital Transactions, or the Partnership's liquidation, and is otherwise nonrecourse against the Partnership.  (*See* LPA, § 5.1)  In other words, once made, a GP Loan may never be repaid to the General Partner.

## IV.   Defendants' Predatory Scheme to Cover Up FWC's Ineptitude and Improperly Benefit Themselves at the Expense of Plaintiffs and the Partnership

106.   In connection with finalizing the LPA and the Partnership's bond construction loan for the Apartment Complex ("**Construction Loan**"), AEP required the Partnership use their affiliate, FWC, as the general contractor for the project, *and* another affiliate, FWM, as the property management company.

107.   Oracle Newnan GP acquiesced to AEP's demand to use FWC and FWM.

108.   To establish the budget and schedule for the project and Plaintiffs' related rights and obligations under the LPA and Development Agreement, the Partnership commissioned a Contractor Cost Analysis, which was performed by

Newbanks, Inc. ("**Newbanks**").  Upon information and belief, Newbanks is a group commonly used on LIHTC projects.

109.   This Contractor Cost Analysis, which was completed in July 2021, supported the total construction cost used by the parties in their closing documents, *i.e.*, $17,124,207.00. The Contractor Cost Analysis noted that the cost per square foot was in the appropriate range for comparable projects.

110.   The Contractor Cost Analysis also supported a 14-month (420-day) construction schedule, which was then utilized in the lease-up schedule and financial proforma for, *inter alia*, budgeted interest expense.

111.   Based on the Contractor Cost Analysis and Defendants' representations to Plaintiffs and the Partnership, on August 14, 2021, the Partnership and FWC executed a "Cost of the Work Plus a Fee with a Guaranteed Maximum Price" construction contract (the "**FWC Contract**") that, *inter alia*: (i) provided a guaranteed maximum price of $16,585,568.00, subject to certain exclusions, additions, and deductions in the contracted-for construction work (the "**Work**"), including through valid change orders; (ii) established a progress payment system that only allowed for payment of costs "necessarily incurred by [FWC] in the proper performance of the Work"; and (ii) required substantial completion not later than 420 calendar days from the date set forth in the Partnership's notice to proceed.

112.   The Partnership issued its notice to proceed on August 27, 2021 (the "**Notice to Proceed**"), which set the date of commencement for the Work as September 23, 2021.

113.   Pursuant to the FWC Contract and the Notice to Proceed, substantial completion of the Work was therefore due October 11, 2022, and final completion was due by October 31, 2022.

114.   Pursuant to Section 15.2 of the LPA, any "Cost Savings" existing on the date of the ILP's third equity Installment were to be used to pay up to 100% of the Deferred Development Fee, and if any balance remained, were to be deposited into the Partnership's Operating Reserve.  (LPA § 15.2; *see also id.* at p.8 (defining "Cost Savings" as the amount by which permitted sources exceeded development costs))

115.  When TCH insisted upon FWC being the general contractor, Defendants were fully aware that time was of the essence in the completion of the Apartment Complex.

116.   Time was of the essence in completing the Apartment Complex because, *inter alia*: (1) debt service on the Construction Loan was required to be paid until conversion to permanent bond financing, which would result in unnecessary debt service costs during periods of delay; (2) delayed completion would delay the lease-up of the Apartment Complex and, thus, delay revenue-

generating activities for the Partnership; (3) the amount of TCH's capital contributions were based, in part, on the timing of its receipt of Housing Credits and Georgia Tax Credits (together, "**Tax Credits**"), which required the Apartment Complex to be leased-up, placed in service, and Form 8609s to be received by the Partnership, which reflect the award of Housing Credits and other essential LIHTC program information; and (4) the LPA includes provisions for the allocation of Tax Credits starting in 2023.  (LPA at p.55 ((b) and (c))

117.    In fact, Section 8.1(a) of the LPA provides that part of the General Partner's construction completion guarantee was for "Rental Achievement on or before July 1, 2023."  (LPA § 8.1(a))

118.    Moreover, Section 8.4(b) of the LPA establishes the General Partner's bond conversion guaranty to "achieve Bond Conversion on or before July 1, 2023." (LPA § 8.4(b))

119.    "Bond Conversion" is defined as, *inter alia*, "Completion of Construction[.]"  (*Id.* at p.3)

120.    The LPA also includes, *inter alia*, the following provisions: (1) Section 9.1 memorializes the expectation that the ILP would receive Tax Credits from 2023 to 2033, (*see id.* at p.55 ((b) and (c)); (2) Section 8.1(A) provides that Plaintiff was required to "achieve Rental Achievement on or before July 1, 2023," which is based on certain benchmarks for Apartment Complex operations over a three-month

period; (3) Section 17.2 recognizes that the Property Manager would be managing the Apartment Complex operations by December 1, 2022; (4) Section 5 of Exhibit B to the LPA includes a "Rent-up Schedule" for the Apartment Complex that spans January 2023 to August 2023; and (5) Section 6.1(a) allows the Limited Partners to demand that the General Partner repurchase the Limited Partner's(s') interest(s) in the Partnership due to the failure to meet certain "Developmental and/or Tax Credit Benchmarks and Standards" (the "**Benchmarks**") including the failure: (a) to have the construction of the Apartment Complex reach 50% completion by September 1, 2022; (b) to receive certificates of occupancy ("**COs**") for "all of the Tax Credit Units" by "September 1, 2023 (or any later date fixed by the General Partner with the Consent of the [ILP])"; (c) to have less than all 96 units of the Apartment Complex occupied by December 1, 2022 (or other mutually agreed upon later date); and (d) to have Form 8609s issued for all Apartment Complex buildings by August 1, 2023 (or other mutually agreed upon later date).

121.   Defendants knew or should have known that FWC's commitment to a 420-day construction timeline was essential to the parties' agreements and that delays to "Rental Achievement" and/or "Bond Conversion" would negatively impact Oracle Newnan GP's substantive and economic rights under the LPA.

122.   Because FWC was the ILP's affiliate and the ILP had consent rights over changing the general contractor and over modifications to the FWC Contract,

including change orders, Plaintiffs (and despite Oracle Newnan GP being the Partnership's general partner) had virtually no control over FWC's construction of the Apartment Complex and was at the mercy of FWC's diligence, or lack thereof, and Defendants' good faith and fair dealing as to, *inter alia*, FWC's construction progress, requests for change orders, and achieving the Benchmarks, which were dependent upon the timeliness of FWC's construction Work.

123.   Put differently, FWC, through its affiliation with the ILP, would have to effectively consent to its own termination or the rejection of costs and/or change orders if the General Partner believed such actions were proper and in the best interests of the Partnership.

124.   Throughout the construction of the Apartment Complex, however, Defendants did not act in accordance with good faith and fair dealing and FWC was not diligent with its Work.

125.   Further, throughout the project, FWC demanded to increase the cost of the Work because of FWC's self-inflicted, unnecessary, and improper incurring of costs and delays, including through change orders largely related to the construction site.

126.   For example, FWC submitted numerous change orders totaling $3,256,581.23, much of which the General Partner disagreed with because, in part, they sought to increase the contract sum for Work already included in the project

plans and specifications and/or were costs caused by FWC's ineptitude and Defendants' overall avarice.

127.   In other words, FWC sought reimbursement of costs that were not necessarily incurred in the proper performance of the Work or from legitimate changes to the scope of the Work.  As one example, the FWC Contract included a landscaping budget that was supposedly put out for competitive bidding from third-parties pursuant to Defendants' representations, but in March of 2023, FWC sought to more than double the $200,000 landscaping and irrigation budget to $477,779.90. A true and correct copy of this communication is attached hereto as **Exhibit F**.

128.   As another example of FWC-caused delays, an email thread from January 2023 shows substantial non-communication within FWC regarding materials, despite that Plaintiffs' principal had selected relevant material "to prevent a schedule issue[.]"  A true and correct copy of this communication is attached hereto as **Exhibit G**.

129.   Nevertheless, TCH, AEP, and JES threatened to declare the General Partner in default if it did not authorize the costs and disputed change orders, thereby causing further duress and resulting in the General Partner otherwise approving costs and change orders it would otherwise not have approved.

130.   The General Partner, under duress, ultimately had to authorize disputed costs and change orders over its objections—and relatedly chose not to declare FWC

in default of its obligations—due only to TCH's, AEP's, and JES's coercive threats and the General Partner's understanding that it would allow the parties to move forward without a fight over alleged defaults for which the General Partner had no control. However, TCH would thereafter purport to declare the General Partner in default anyway.

131.    Despite Defendants coercing the General Partner and putting it under duress to approve these improper costs and change orders, FWC failed to pay all of its own subcontractors and obtain necessary lien waivers, resulting in multiple mechanic's liens being recorded against the Apartment Complex.

132.    General Partner requested, but has never received, a final lien waiver from FWC.

133.    When the General Partner's affiliate in the Limestone Project was on site confronting FWC's project manager (Bobby Holmes) over change orders and other decisions leading to, *inter alia*, continuing project delays regarding the Limestone Project, Holmes explained: "we had our ass handed to us at Newnan, we need to make it up here."

134.    Ultimately, the contract sum totaled $19,924,951.96, a substantial and unjustified increase to the original $16,585,568 guaranteed maximum contract price.

135.    $2,203,044.00 of the Development Fee remains unpaid and is due and owing to the Developer by the Partnership.

136.    Notwithstanding all the funds that should have been used to pay the Non-Deferred Development Fee going instead to FWC (and FWC nevertheless failing to obtain all lien waivers), Defendants claimed that FWC was still owed approximately another $700,000.  Pursuant to a letter dated February 14, 2024, AEP, as the designated agent and self-described "Affiliate of the Limited Partners," purported to pay this amount directly to FWC (their other affiliate) through an alleged LP Loan purportedly made to the Partnership.  A true and correct copy of this correspondence is attached hereto as **Exhibit H**.

137.    TCH asserts that this alleged LP Loan was necessitated by the General Partner's default under the LPA (such loans, *if valid*, being defined in the LPA as a "**Default LP Loan**").

138.    This alleged Default LP Loan was not due to any default under the LPA or Development Agreement by Plaintiffs, and was not validly made by AEP on behalf of TCH.

139.    Upon information and belief, this alleged Default LP Loan only funded unnecessary costs caused by FWC's ineptitude and/or improper performance of the Work, as did the improper change orders totaling far more than the amount of the alleged Default LP Loan.  Accordingly, the General Partner had no obligation to fund the alleged Default LP Loan that AEP made on behalf of TCH and the Partnership has no obligation to pay the alleged Default LP Loan.

140.   Like the improper construction delays and adjustors subsequently demanded, AEP made this alleged Default LP Loan in an attempt to manufacture a basis, where none existed, to recoup FWC's self-inflicted losses due to its ineptitude in performing the Work.

141.   Upon information and belief, by purporting to make the alleged Default LP Loan, Defendants sought to usurp Plaintiffs' economic rights under the LPA and/or Development Agreement by: (i) forcing the General Partner to pay off the alleged Default LP Loan within 6 months through a purported Cure Payment to avoid the ostensible reduction of the General Partner's rights to Cash Flow and Cash from Capital Transaction under the LPA (which would, in turn, benefit TCH, AEP, and JES); and/or (ii) purportedly obtaining priority over Plaintiffs' economic rights.

142.   FWC's lack of diligence and failure to timely complete the Work also caused harm to Plaintiffs and the Partnership.

143.   For example, despite that the Work was supposed to commence according to the date stated in the Notice to Proceed (September 23, 2021), and in connection with financing, as FWC represented to Plaintiffs and the Partnership that it would do, FWC did not actually begin the Work on time.

144.   Moreover, the project experienced numerous delays thereafter due to FWC's continuing ineptitude, including due to employee turnover, the failure to develop and follow a schedule, and improper performance of the Work.

145.    Thus, despite time being of the essence, FWC breached the FWC Contract by failing to achieve substantial or final completion of the Work by October 2022.

146.    Ultimately, the Partnership did not receive the COs for the Apartment Complex's buildings until late November 2023 through late February 2024—well-beyond the substantial completion and final completion date of October 2022 established through the FWC Contract and Notice to Proceed.

147.    Specifically, instead of completing the Work in 14 months (*i.e.*, 420 days), as promised, FWC took 29 months, from September 2021 to February 2024.

148.    Such doubling of the construction period effectively doubled the interest on the Construction Loan and required payments for extensions to the Construction Loan and builders risk insurance, and resulted in lost rental income (*i.e.*, lost opportunities).

149.    Based on this delay, FWC caused the Partnership, at minimum, more than $1 million in damages because of increased debt service costs and lost revenue.

150.    The General Partner's principal attempted to communicate with Defendants and FWC about timelines and progression throughout this ordeal, but was met with poor communication, disinterest, and hostility.

151.    In connection with the extensive discussions with Defendants about the delays and other construction issues, including disputed change orders, in and

around January 2024, the General Partner's principal contacted Brian Kimes ("**Kimes**"), an executive vice president at JES—FWC's parent company—and identified how construction delays had resulted in approximately $1,133,730 in lost rental income. A true and correct copy of this communication is attached hereto as **Exhibit I**.

152. Based on a FWC's inability to complete the Work by October 2022, Plaintiffs were unable to satisfy the Benchmarks.

153. By FWC (through TCH, AEP, and JES) negotiating a 420-day completion period and failing to diligently complete the Work, it was impossible or impracticable for the General Partner to satisfy the Benchmarks; and thus, TCH either implicitly agreed, through its and its affiliates' actions, to a later date for the satisfaction of the Benchmarks and/or is estopped from seeking to inequitably enforce Benchmarks that were impossible and/or impracticable for the General Partner to satisfy through no fault of the General Partner, but only through the fault of TCH's affiliate, FWC.

154. The General Partner undertook all reasonable, good-faith efforts within its power to have FWC timely complete the Work so the General Partner could satisfy the Benchmarks and/or mitigate the delay in construction completion—and, thus, the lease-up of the Apartment Complex—caused by FWC.

155.   Given TCH's, AEP's, and JES's affiliation with FWC and TCH's consent right over any change in the general contractor for the Apartment Complex, terminating FWC and hiring a new general contractor to complete the Work was not, by AEP's design, an action meaningfully available to the General Partner.

156.   Despite the General Partner's good-faith efforts to have FWC timely complete the Work, TCH, AEP, and JES did not similarly act reasonably and in good faith.

157.   During these construction delays, the General Partner contacted AEP and FWC multiple times to obtain updated timelines for completing construction due to Georgia Department of Community Affairs (the "**DCA**") timelines that, if missed, risked significant penalties, and risked the Plaintiffs' ability to submit future LIHTC applications.

158.   The DCA is a state agency tasked with overseeing the LIHTC program in Georgia and requires submission of a packet of information pertaining to a LIHTC project before issuing the Internal Revenue Service ("**IRS**") Form 8609, which finalizes the allocation of Housing Credits.

159.   In connection with these repeated requests for timelines to meet DCA deadlines, on November 30, 2022, the General Partner asked FWC's representatives and Defendants' representative, Kimes, how long of an extension should be sought, expressing the understanding that the Apartment Complex would be completed by

April 1, 2023.  Rather than FWC promptly responding, Kimes responded over a week later by stating to "just ask for 6 months so you don't have to go back to them." A true and correct copy of this communication is attached hereto as **<u>Exhibit J</u>**.

160.   In January 2023, the General Partner again followed up with FWC regarding a current schedule for completion so lease-up could promptly commence after completion.  In response, FWC admitted it would need time to put together a schedule, thus admitting it did not have a current schedule it was following to ensure timely completion.  A true and correct copy of this communication is attached hereto as **<u>Exhibit K.</u>**

161.   In June 2023, the Apartment Complex was still not complete, requiring the General Partner to have to ask DCA for another extension, notwithstanding Kimes previously suggesting the General Partner ask for a 6-month extension so the General Partner would not have to ask for another.  Accordingly, the General Partner again asked FWC and Kimes how much additional time would need to be requested from DCA and posed various questions about the status of construction.  A true and correct copy of this communication is attached hereto as **<u>Exhibit L</u>**.

162.   In addition to the above-mentioned failure to prioritize the timely completion of the Work and the improper change order demands and threats, TCH, AEP and JES repeatedly ignored the General Partner's requests for the closing pro

forma used to forecast the anticipated credit delivery schedule and TCH's expected benefits.

163.   Moreover, despite all of the FWC-caused construction delays and their knock-on effect on Plaintiffs' ability to meet Benchmarks, TCH sent a notice of default to the General Partner based on non-compliance with the Benchmarks (the "**2/14/24 Oracle Newnan Notice of Default**").   A true and correct copy of the 2/14/24 Oracle Newnan Notice of Default is attached hereto as **Exhibit M**.

164.   TCH issued the 2/14/24 Oracle Newnan Notice of Default despite that Plaintiffs held extensive discussions about construction delays and disputed change orders, during which AEP represented it would **not** declare the General Partner in default if it authorized the disputed change orders and would **not** seek to hold the General Partner responsible for the delays through Tax Credit timing adjustors.

165.   This 2/14/24 Oracle Newnan Notice of Default alleged that the General Partner was at fault for failing to satisfy Benchmarks, such as having all 96 units of the Apartment Complex occupied by December 1, 2022, that were impossible and/or impracticable for the General Partner to satisfy through no fault of the General Partner.  In fact, all of the alleged defaults were directly caused by and attributable to FWC.

166.   Even though the Apartment Complex and the Limestone Project were governed by different contracts on different timelines, TCH (by and through AEP

and JES) also sent a purported notice of default to Plaintiffs' affiliate on the same day concerning the Limestone Partnership (the "**2/14/24 Limestone Notice of Default**") (collectively, the "**2/14/24 Notices of Default**").  A true and correct copy of the 2/14/24 Limestone Notice of Default is attached hereto as **Exhibit N**.

167.   The 2/14/24 Notices of Default remarkably alleged virtually identical bases, although the alleged defaults relating to the Limestone Partnership were approximately 6 months to a year newer than the alleged defaults relating to this Partnership.

168.   One alleged default stated in the 2/14/24 Oracle Newnan Notice of Default was approximately 2.5 years old.

169.   Like the alleged defaults relating to this Partnership, the alleged defaults relating to Limestone Partnership were directly caused by FWC.

170.   In the General Partner's ensuing conversation with Kimes, he stated that JES sent these default notices because TCH's investor had sent AEP and/or JES a notice of default.  In other words, Defendants were seeking to shift onto Plaintiffs the blame for FWC's (their affiliate's) failures to timely and properly construct the Apartment Complex and the Limestone Project.  A true and correct copy of correspondence recounting this conversation, without dispute, is attached hereto as **Exhibit O**.

171.   Despite, as reflected in Exhibit O, Plaintiffs' efforts to communicate with JES and AEP thereafter, Defendants did not respond or ultimately make themselves available.  This failure to respond was a pattern and common practice for Defendants that intensified over time.

172.   Notwithstanding TCH's bad-faith 2/14/24 Notices of Default, Plaintiffs continued their good-faith efforts to mitigate FWC's delays and ineptitude, lease-up the Apartment Complex as efficiently and effectively as possible, fulfill the remaining conditions necessary to receive the third and fourth capital contribution Installments from TCH, and amicably proceed to the conversion of the Construction Loan to the permanent loan (the "**Permanent Loan**").

173.   In connection with the Permanent Loan, a March 5, 2024 Independent Auditor's Report showed only $157,889 in Deferred Development Fees in connection with the "Final Cost Certification" for the construction of the Apartment Complex (meaning the vast majority would be paid in connection with the Permanent Loan Conversion).  A true and correct copy of this audit is attached hereto as **Exhibit P**.  (*See* Exhibit P at 6 (reflecting "Deferred Devlpr Fee"))

174.   However, the day before the Permanent Loan Conversion—after a $1,523466.88 Development Fee invoice and DCA fee reimbursement invoice had been submitted to the DCA weeks before, after AEP's review and approval, in connection with obtaining the Form 8609s for the project—AEP demanded that both

invoices be pulled and, within a week, submitted an adjustment to the Tax Credits that it had confirmed it would not pursue due to construction delays caused by its affiliate, FWC.

175.  A true and correct of an email thread showing AEP's last-second demand to "remove the paydown of the LP loans, DCA Fee- Reimbursement and Develop[ment] Fee" is attached hereto as **Exhibit Q**.

176.  Indeed, Kimes, the AEP and JES executive, had distributed spreadsheets in the first quarter of 2024 that did *not* show credit adjustors diminishing the Developer's Development Fee.

177.  And—prior to AEP's last-minute scheme to diminish Plaintiffs' economic benefits through Housing Credit and Georgia Tax Credit adjustors, timing adjustors, and other actions—when Plaintiffs expressed concern over the cost overages (due to change orders and construction loan interest), progress delays, and generally lagging timelines caused by Defendants, Kimes represented to Plaintiffs not to worry about Tax Credit adjustors, or other timing adjustors that could diminish the Development Fee or other amounts due to Plaintiffs.  (*E.g.*, LPA §§ 4.2(d)-(e))

178.  Based on such actions and assurances that occurred prior to AEP's last-minute reversal, the Developer also advanced approximately $50,000 to pay the DCA fee with the intent and understanding that it would be reimbursed at the

Permanent Loan Conversion, but as noted above, AEP also caused such reimbursement to be struck at the last minute.

179.   Conversely, TCH (under the direction and control of AEP and JES) only continued its bad-faith efforts to cover up FWC's failures and erode Plaintiffs' economic rights for Defendants' benefit.

180.   For example, on May 16, 2024, during the General Partner's ongoing good-faith efforts to satisfy the Installment conditions that FWC made impossible and/or impracticable to satisfy under the LPA's original deadlines, TCH purported to provide notice of another alleged Default LP Loan to purportedly pay debt service costs, including a $100,000 extension fee for the Construction Loan that would have been avoided and/or could have been funded through Partnership a FWC timely commenced and completed the Work and properly protected the Partnership from mechanic's liens by timely paying its subcontractors.  A true and correct copy of this correspondence is attached hereto as **Exhibit R**.

181.   Then, during the summer of 2024 when the General Partner was coordinating the submission of the Form 8609s for the Apartment Complex with the DCA, the DCA performed an inspection in connection therewith.

182.   Pursuant to this inspection, the DCA required a few corrections be made to the site.

183.   FWC attempted to bill the General Partner for addressing the DCA's corrections, despite that such items were within FWC's scope of work.

184.   FWC did not complete the DCA-required corrections in a timely manner, which delayed the General Partner's ability to submit the Form 8609 application for the Apartment Complex, which was a precondition to TCH's third capital contribution.

185.   Such FWC-caused delays also delayed the General Partner's ability to obtain the Form 8609s for the Apartment Complex.

186.   AEP also engaged in other stall, delay, and bad-faith tactics so that it could use Plaintiffs as a scapegoat for FWC's failures, which have diminished the General Partner's ability to collect its Development Fee as promised under the LPA.

187.   Contrary to prior representations, TCH is pursuing a downward $1,430,293.67 Tax Credit timing adjustor, consisting of an $831,182.10 Housing Credit timing adjustor, and a $589,111.57 Georgia Tax Credit adjustor.

188.   Such a timing adjustor, *if* valid, reduces the General Partner's ability to recover its Development Fee.  Indeed, tellingly, this downward Tax Credit timing adjustor closely approximates the $1,523466.88 in Development Fees that, until AEP's coercive demand *the day before* the Permanent Loan Conversion, was supposed to be paid in connection with the Permanent Loan Conversion.

189.  TCH continues not to be entitled to the alleged downward Tax Credit timing adjustor for, at least, two reasons.

190.  First, the delay in the receipt of Tax Credits was due to TCH's affiliate's own ineptitude and delays in completing the Work, not due to any fault of the Partnership or Plaintiffs.

191.  Second, TCH assisted FWC in negotiating for, and at best, agreed to, a 420-day construction schedule that FWC could not meet.  TCH thus effectively elected to have the Credit Period deferred and, pursuant to Section 4.2(d) and (e) of the LPA, TCH is not entitled to downward Tax Credit timing adjustors when it elects to defer the commencement of the Credit Period.

192.  Rather than place FWC in default, which would have been fruitless, Plaintiffs attempted to work in good faith with Defendants in hopes that they would honor their promises and representations to make capital contributions from which the Development Fee would be paid.

193.  Rather than cooperate, however, TCH continued to pursue its misplaced cover-up campaign by sending another notice letter on March 14, 2025, alleging that Plaintiffs had defaulted under their Guaranty Agreement, dated August 27, 2021, which was executed contemporaneously with the LPA and attached thereto as Exhibit F (the "**Guaranty**").

194.   Specifically, TCH alleged, for the first time, that Plaintiffs had now violated the Guaranty by failing to accede to TCH's demands to pay the alleged Default LP Loans it had started making *over a year earlier* to pay FWC and the debt service costs caused by FWC's failure to timely commence and complete the Work.

195.   The same day, TCH also issued a virtually identical notice of default in relation to Limestone Partnership.  True and correct copies of these March 14 notice letters are attached hereto as **Exhibit S** and **Exhibit T**.

196.   Further confirming Defendants' strategy of either forcing Plaintiffs to cover FWC's self-inflicted losses or forcing Plaintiffs out of this Partnership and the Limestone Partnership so Defendants could recover those amounts by usurping Plaintiffs' economic rights, on April 10, 2025, TCH's counsel sent a feigned "Offer of Compromise" concerning both this Partnership and the Limestone Partnership. Therein, TCH announced its "deci[sion] that it would be in the best interests of all parties involved if the General Partner[] withdraw[s] from the [Partnership]", and accordingly threatened to pursue the removal of the General Partner from the Partnership and force the General Partner to contribute millions of dollars of Deferred Development Fees to the Partnership, unless the General Partner voluntarily abandoned its general partner interest (valued to be worth millions of dollars) and withdrew from the Partnership in exchange for a mere $375,000 payment (in lieu of receiving approximately $2.2 million in due and owing

Development Fees). TCH made the same threat to the General Partner's affiliate in the Limestone Partnership. A true and correct copy of this April 10 correspondence is attached hereto as **Exhibit U**.

197. The following day, Plaintiffs' counsel reiterated that there was no breach of the Guaranty or LPA because the amounts paid by AEP as alleged Default LP Loans were not the responsibility of the Partnership and, thus, not Development Deficits that the General Partner was obligated to cover under the LPA. A true and correct copy of this April 11 correspondence (excluding its enclosures) is attached hereto as **Exhibit V**.

198. TCH did not respond to Plaintiffs' April 11 correspondence.

199. Instead, a little over two months later, while the General Partner continued to operate the Partnership and oversee the management of the Apartment Complex to the benefit of TCH, TCH sent a letter dated June 16, 2025, purporting to remove the General Partner from the Partnership based on the same alleged, baseless defaults it had been asserting for over a year, which were a front to avoid the fact that FWC is to blame for all the downstream problems for which TCH complained.

200. Through a letter, also dated June 16, 2025, TCH also purported to remove the General Partner's affiliate from the Limestone Partnership based on

virtually identical, misplaced allegations of default.  True and correct copies of these June 16 letters are attached hereto as **Exhibit W** and **Exhibit X**.

201.   By letter dated June 27, 2025, Plaintiffs once again unequivocally rejected TCH's baseless allegations of default and reaffirmed that it had not been removed from the Partnership and had not lost any rights under the LPA. Nevertheless, subject to a full reservation of rights, which Plaintiffs notified Defendants they would seek to have declared and enforced through this action, the General Partner agreed to allow TCH's designee to temporarily assume control of the Partnership to avoid unnecessary contentiousness between the parties.  A true and correct copy of this June 27 letter is attached hereto as **Exhibit Y**.

202.   Subsequently, the parties worked to complete the Partnership's audited financial statements for 2024.

203.   TCH has continued to insist that it has made approximately $1.2 million in loans to the Partnership, and those funds should be booked on the Partnership's financial statements as such.

204.   As a result, the Partnership's accounting firm, Eisner Advisory Group LLC (who has combined with Tidwell Group, LLC) ("**EisnerAmper**") rescinded its audit opinion on the Partnership's financial statements for the year ended December 31, 2024, because, *inter alia*, advances to the Partnership by TCH were netted with capital receivable from TCH, which TCH disputes, but EisnerAmper noted was not

in accordance with generally accepted accounting principles ("**GAAP**").  A true and correct copy of the audit rescission letter is attached hereto as **Exhibit Z**.

**COUNT I**
**DECLARATORY JUDGMENT AND REQUEST FOR INJUNCTIVE RELIEF**
**(Plaintiffs against Defendants)**

205.   Plaintiffs incorporate the foregoing paragraphs by reference as if fully stated herein.

206.   O.C.G.A §§ 9-4-2 through 9-4-11 provide litigants with the right to seek declaratory judgments to construe contracts and declare the legal relations of parties thereunder, either before or after a breach.

207.   The LPA, Development Agreement, and Guaranty (collectively, the "**Contracts**") are valid, enforceable, and binding contracts.

208.   As set forth herein, TCH has falsely accused Plaintiffs of respectively being in default of the Contracts.

209.   Further, TCH, AEP, and/or JES has wrongly invoked these alleged defaults to purportedly make various alleged LP Loans, including alleged Default LP Loans, to the Partnership.

210.   Further, TCH has wrongly invoked these alleged defaults to declare that the General Partner: (i) has been removed from the Partnership, effective immediately, (ii) is not entitled to any further rights under the LPA, and (iii) must

make a special capital contribution to the Partnership in the amount of the Deferred Development Fees.

211.   Further, TCH has wrongly invoked these alleged defaults to declare that the Developer is not entitled to receive any further Development Fees, deferred or otherwise.

212.   Defendants also wrongfully induced the General Partner, through misrepresentation and duress, to acquiesce to costs and change orders disputed by the General Partner.

213.   TCH's actions have created uncertainty and a concrete and immediate justiciable controversy, which entitles Plaintiffs to have such doubts removed.

214.   Accordingly, Plaintiffs are entitled to, and hereby respectfully request, judicial declarations, together with all necessary attendant supplemental relief, that:

   a.   Plaintiffs are not and have never been respectively in default of the Contracts, and TCH's notices of default and/or removal are invalid and unenforceable;

   b.   Plaintiffs have performed all of their respective duties and obligations under the Contracts;

   c.   TCH has, alternatively, waived, elected to amend, and/or is estopped from enforcing certain Benchmarks, conditions, and/or

requirements under the Contracts based upon TCH's and its affiliates' actions;

d.    TCH, AEP, and/or JES have not validly made any LP Loans, including Excess LP Loans or Default LP Loans, to the Partnership, and the payment of such funds constituted either required capital contribution Installments or were paid in satisfaction of damages caused by them and/or their affiliate, FWC;

e.    The General Partner is, and has always remained, the general partner of the Partnership, and was not validly declared to be removed from the Partnership;

f.    The General Partner is not liable for the activities of the Partnership and its partners during the period that TCH purported to have removed the General Partner therefrom and the General Partner was not acting as the Partnership's general partner;

g.    The General Partner's rights and entitlements under the LPA have continued uninterrupted, and TCH, AEP, and/or JES must cause such entitlements which have been wrongfully withheld from the General Partner and/or disbursed to some other party to be returned to the General Partner;

h.     The Developer's rights and entitlements under the Development Agreement have continued uninterrupted, and TCH, AEP, and/or JES must cause such entitlements which have been wrongfully withheld from the Developer and/or disbursed to some other party to be returned to the Developer;

i.     The disputed change orders executed under false pretense and duress are invalid and unenforceable, and Defendants must pay the same amount of funds to the Partnership to be used to satisfy the Partnership's obligations, including the payment of the Development Fee;

j.     TCH is not entitled to any downward Tax Credit timing adjustors;

k.     TCH has breached the LPA, and Plaintiffs are entitled to damages in an amount to be determined at trial, plus all other just and appropriate supplemental relief.

215.   All persons or entities having an actual, present, and adverse interest are parties to this action, and these interests are properly before this Court.

216.   Plaintiffs are not merely seeking the giving of legal advice from the Court or the answer to questions propounded from curiosity.

217.    The threatened act of interference with the General Partner's management rights also has no adequate remedy at law, and the General Partner's and Partnership's consequent irreparable harm can only be neutralized through the granting of injunctive relief.

218.    The public interest would best be served by forestalling and nullifying TCH's attempted hostile takeover.

219.    The equities of the situation therefore justify the granting of the injunctive relief sought by the General Partner.

## COUNT II
## BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Plaintiffs against TCH)

220.    Plaintiffs incorporate the foregoing paragraphs by reference as if fully stated herein.

221.    The LPA and Guaranty include an implied covenant of good faith and fair dealing, requiring that TCH, among other things, not do anything to impair Plaintiffs' rights to receive its bargained-for benefits thereunder and/or interfere with any obligations that Plaintiffs may have thereunder.

222.    Additionally, under established Georgia law, a party may not derive a benefit from its own wrongdoing, including, but not limited to, its breach of a contract.

223.  Accordingly, TCH may not derive a benefit from its breach of the LPA and Guaranty and their respective covenants of good faith and fair dealing.

224.  As set herein, however, TCH has sought to utilize its affiliate's failure to timely commence and properly complete the Work on the Apartment Complex, and/or its own direct or indirect approval of a construction schedule that made fulfilling the Benchmarks impossible or impracticable, to falsely accuse Plaintiffs of respectively being in default of the LPA and Guaranty and derive a benefit therefrom for itself and its affiliates, in breach of the LPA and Guaranty and their implied covenants of good faith and fair dealing.

225.  For example, as set forth herein, TCH has wrongly invoked these alleged defaults to interfere with, and usurp for it and its affiliates' benefit, Plaintiffs' respective rights and obligations under the Contracts by, *inter alia*: (i) purportedly having AEP and/or JES make alleged interest-bearing LP Loans, including alleged Default LP Loans, to the Partnership that, if valid, erode Plaintiffs' economic rights; and ultimately (ii) purporting to remove the General Partner from the Partnership after Plaintiffs' development obligations were complete, thereby purporting to unconscionably strip Plaintiffs of all of their respective rights, economic or otherwise, under the LPA and Development Agreement, without any meaningful consideration, and effectively transfer those benefits to TCH and its affiliates.

226.   Further, TCH breached the LPA and its implied covenant of good faith and fair dealing by wrongly failing representing that it would not seek Tax Credit timing adjustors, only to do so just before the Permanent Loan Conversion.

227.   TCH's actions have been unreasonable and undertaken in a bad-faith attempt to conceal its and its affiliates' failures and wrongdoing and mitigate their losses by usurping Plaintiffs' rights under the LPA and Development Agreement.

228.   Because of TCH's breaches of the LPA and Guaranty, including their implied covenants of good faith and fair dealing, TCH has caused Plaintiffs to suffer damages, including, without limitation, delayed payment of fees under the LPA and Development Agreement and lost opportunity damages resulting therefrom, in an amount to be proven at trial.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Plaintiffs against Defendants)

229.   Plaintiffs incorporate the foregoing paragraphs by reference as if fully stated herein.

230.   AEP and JES are not parties to the Contracts.

231.   However, AEP and JES have knowledge of the existence the Contracts, including because of their affiliation with TCH.

232.   TCH is not a party to the Development Agreement.

233.   However, TCH has knowledge of the existence of the Development Agreement, including because the Development Agreement is an exhibit to the LPA, is referenced in the LPA, and payments due under the Development Agreement are, in part, governed by the LPA.

234.   JES wholly owns, and is the parent company of, FWC and AEP.

235.   AEP directly or indirectly owns a partial ownership interest in TCH.

236.   Upon information and belief, the remainder of the ownership interests in TCH are owned by a tax-credit investor that has no affiliation with any of Defendants and has its own respective interests principally based on the receipt of Housing Credits and other tax benefits.

237.   Conversely, upon information and belief, AEP's and JES's respective interests in TCH are principally based on cash benefits that may become available and are paid in exchange for their management of TCH.

238.   Accordingly, AEP and JES do not share a complete identity of interests with TCH's unaffiliated tax-credit investor owner.

239.   However, upon information and belief, AEP, as the manager and/or managing owner in TCH, owes fiduciary duties to the tax-credit investor owner.

240.   Upon information and belief, AEP manages and controls TCH, subject only to certain consent rights held by the tax-credit investor owner.

241.   JES, as the parent company of AEP, has the ability to direct AEP's actions as the partial owner and manager of TCH.

242.   JES, as the parent company of AEP, has in fact directed some or all of AEP's actions as the partial owner and manager of TCH, as alleged herein.

243.   Upon information and belief, while FWC has no ownership interest in TCH, FWC is an affiliate of TCH because it shares common ownership and control with AEP and JES.

244.   As set forth herein, TCH, under the direction and control of AEP and JES, has knowingly and unjustifiably interfered with the Development Agreement between the Partnership and Developer by, *inter alia*, wrongly declaring Plaintiffs in default under the LPA and Guaranty based on the failings of, and damages caused by, its own affiliate, FWC.

245.   TCH did so to the detriment of the Partnership and Developer, and only to benefit itself and its affiliates.  For example, the net result of TCH's actions were to: (i) cause the Partnership to pay money to its affiliate, FWC (pursuant to, for example, improper change orders) that should not have been paid, (ii) thereby leave the Partnership with insufficient funds to pay its legitimate obligations, including debt service costs and the Development Fee obligations under the Development Agreement to the Developer, and (iii) manufacture a basis for TCH to mischaracterize its equity Installments as interest-bearing loans to be repaid to TCH

and attempt to erode the General Partner's rights to Annual Partnership Management Fees, Cash Flow, and Cash From Capital Transactions under the LPA.

246.   Relatedly, as set forth herein, AEP and JES have knowingly and unjustifiably interfered with both the Development Agreement and the LPA by causing TCH to take the above-mentioned actions.

247.   AEP and JES did so to the knowing detriment of Plaintiffs, the Partnership, and TCH's tax-credit investor owner, and only to benefit AEP, JES, and FWC.  This is because, upon information and belief, the wrongful actions AEP and JES caused TCH to take would result or likely result, whether presently or in the future, in cash-based benefits flowing ultimately to AEP, JES, and FWC, not TCH's tax-credit investor owner who invested primarily for tax benefits.

248.   Upon information and belief, by AEP and JES causing TCH to take these actions, they are causing TCH to act outside the scope of its authorized business purpose because, as a tax credit fund, TCH's business purposes do not include pursuing cash benefits not bargained for or expected, especially when it could come at the expense of the tax-credit investor owner's tax benefits in the form of reduced Housing Credits or tax losses.  *See JER*, 275 A.3d at 796-98 (concluding that, in relation to a tax credit fund, a tax credit syndicator's (*i.e.*, AEP's) duty "contemplates preserving tax credit value but does not contemplate pursuing equity value….").

249.    Further, AEP and JES have acted and continue to act with an improper purpose: to benefit and enrich themselves and their affiliate, FWC, at the expense of all others, including TCH's tax-credit investor owner.  Specifically, AEP and JES have placed the financial health of the Partnership and Apartment Complex at risk in attempting to extract cash from the Partnership and General Partner to which they and FWC are not entitled, in order to, at minimum, recoup the losses incurred by FWC due to its ineptitude in constructing the Apartment Complex and the Limestone Project.

250.    This wrongful interference by Defendants was designed to impede, and has in fact impeded, *inter alia*: (i) the General Partner's ability to effectively manage the Partnership and receive all of its bargained-for economic benefits available under the LPA; and (ii) the Partnership's ability to pay, *inter alia*, due and owing Development Fees to the Developer under the Development Agreement.

251.    Defendants' tortious interference with the LPA and Development Agreement has caused Plaintiffs to suffer damages, including, without limitation, lost opportunity damages.  AEP's and JES's tortious interference has additionally caused Plaintiffs to suffer damages in the form of attorney's fees, costs, and expenses because their actions have forced Plaintiffs to commence this action against TCH to clarify and enforce Plaintiffs' rights under the Contracts.

## COUNT IV
## AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACT
### (Plaintiffs against Defendants)

252.   Plaintiffs incorporate the foregoing paragraphs by reference as if fully stated herein.

253.   As set forth herein, Defendants aided and abetted each other's respective tortious interference with the Contracts by providing substantial assistance to each other.

254.   Among other things, FWC concocted improper change orders and demanded that they be paid, thereby causing all available Partnership funds to be funneled to FWC.

255.   AEP, JES, and TCH, in turn, induced the General Partner, through false pretense and duress, to authorize these improper change orders on behalf of the Partnership.

256.   FWC also caused the time to complete the Work to more than double, which created a downstream effect on the General Partner's ability to meet its Benchmarks, which AEP and JES sought to take advantage of for their economic benefit in a scheme to make up for FWC's delays.

257.   AEP and JES then purported to cause TCH to make alleged interest-bearing Default LP Loans to cover alleged shortfalls thereafter resulting from the

funding of these improper change orders to FWC and the construction delays it caused.

258.    AEP and JES then caused TCH to repeatedly declare the General Partner in default and ultimately purport to remove the General Partner from the Partnership, thereby seeking to usurp all of Plaintiffs' economic rights under the LPA and Development Agreement, which benefits, upon information and belief, would ultimately inure to the benefit of AEP and JES.

259.    Defendants knew that by engaging in their respective conduct, they would be substantially assisting each other to intentionally and unjustifiably interfere with Plaintiffs' contractual rights under the LPA and Development Agreement.

260.    Because each of the Defendants aided and abetted, benefitted from, participated in, conspired with, and substantially assisted and encouraged each other's tortious interference and other wrongful conduct, Defendants are jointly and severally liable for the damages caused to Plaintiffs.

## COUNT V
### FRAUD
### (Plaintiffs against Defendants)

261.    Plaintiffs incorporate the foregoing paragraphs by reference as if fully stated herein.

262.    As set forth herein, to induce the General Partner to go along with FWC's delays to complete the Work on time, and authorize improper costs and

change orders that were disputed by the General Partner: (i) FWC knowingly and intentionally misrepresented and insisted that the change orders were valid and for work and materials outside of the scope of the project's plans and specifications, when they were not; and (ii) TCH, AEP, and JES knowingly and intentionally misrepresented and created the false impression that TCH would not pursue timing adjustors or purport to place the General Partner into default so long as the General Partner authorized and did not pursue further action or challenge the change orders, when TCH, AEP, and JES had no intention of honoring such representations.

263. The General Partner relied on these misrepresentations when withholding from placing FWC in default and authorizing the change orders, refraining from declaring Defendants in default of their respective obligations, and refraining from trying to obtain TCH's consent to remove FWC as general contractor, which the General Partner would not have done absent Defendants' misrepresentations.

264. The General Partner's reliance on these misrepresentations at the time they occurred was reasonable under the circumstances.

265. The General Partner was consequently damaged because, *inter alia*: (i) the Partnership was left with insufficient funds to pay its legitimate obligations, including debt service costs and the Development Fee obligations under the Development Agreement to the Developer, and (ii) it facilitated TCH's

mischaracterizations of its equity Installments as interest-bearing loans and attendant attempts to erode and usurp the General Partner's rights to Cash Flow, Annual Partnership Management Fees, and Cash From Capital Transactions, including by subsequently declaring the General Partner in default and purporting to remove the General Partner from the Partnership.

## COUNT VI
## CIVIL CONSPIRACY
### (Plaintiffs against Defendants)

266.   Plaintiffs incorporate the foregoing paragraphs by reference as if fully stated herein.

267.   As set forth herein, each of the Defendants conspired and committed overt acts in concert and pursuant to a common design to: (i) allow FWC to recoup all of its self-inflicted losses in connection with the construction of the Apartment Complex and/or Limestone Project through improper, fraudulent change orders; (ii) to cover up TCH's, AEP's and/or JES's defaults in relation to TCH's tax credit investor owner by blaming Plaintiffs for FWC's ineptitude and delays in constructing the Apartment Complex; and (iii) to usurp all of the Plaintiffs' economic rights under the LPA and Development Agreement through, among other things, mischaracterizing TCH's required equity Installments as alleged interest-bearing LP Loans, claiming entitlement to downward timing adjustors, declaring

Plaintiffs in default of the Contracts, and ultimately purporting to remove the General Partner from the Partnership.

268.  Because each of the Defendants aided and abetted, benefitted from, participated in, conspired with, and substantially assisted and encouraged each other's tortious interference, fraud, and other wrongful conduct, Defendants are jointly and severally liable for the damages caused to Plaintiffs.

**WHEREFORE**, Plaintiffs pray for relief, and are entitled to, a Court order and judgment finding and declaring that:

    a.    Plaintiffs are not and have never been respectively in default of the Contracts, and TCH's notices of default and/or removal are invalid and unenforceable;

    b.    Plaintiffs have performed all of their respective duties and obligations under the Contracts;

    c.    TCH has, alternatively, waived, elected to amend, and/or is estopped from enforcing certain Benchmarks, conditions, and/or requirements under the Contracts based upon TCH's and its affiliates' actions;

    d.    TCH, AEP, and/or JES have not validly made any LP Loans, including Excess LP Loans or Default LP Loans, to the Partnership, and the payment of such funds constituted either

required capital contribution Installments or were paid in satisfaction of damages caused by them and/or their affiliate, FWC;

e.      The General Partner is, and has always remained, the general partner of the Partnership, and was not validly declared to be removed from the Partnership;

f.      The General Partner is not liable for the activities of the Partnership and its partners during the period that TCH purported to have removed the General Partner therefrom and the General Partner was not acting as the Partnership's general partner;

g.      The General Partner's rights and entitlements under the LPA have continued uninterrupted, and TCH, AEP, and/or JES must cause such entitlements which have been wrongfully withheld from the General Partner and/or disbursed to some other party to be returned to the General Partner;

h.      The Developer's rights and entitlements under the Development Agreement have continued uninterrupted, and TCH, AEP, and/or JES must cause such entitlements which have been wrongfully withheld from the Developer and/or disbursed to some other party to be returned to the Developer;

i. The disputed change orders executed under false pretense and duress are invalid and unenforceable, and Defendants must pay the same amount of funds to the Partnership to be used to satisfy the Partnership's obligations, including the payment of the Development Fee;

j. TCH is not entitled to any downward Housing Credit adjustor;

k. The General Partner is entitled to replace FWM, Defendants' affiliate, with a new Property Manager.

l. TCH has breached the LPA, Guaranty, and their respective covenants of good faith and fair dealing, and Plaintiffs are thus entitled to damages in an amount to be determined at trial, plus all other just and appropriate supplemental relief;

m. TCH has tortiously interfered with the Development Agreement, and the Developer is thus entitled to damages in an amount to be determined at trial;

n. AEP and JES have tortiously interfered with the Contracts and forced Plaintiffs into a lawsuit with TCH, and Plaintiffs thus are entitled to damages in an amount to be determined at trial, including attorneys' fees, costs, and expenses incurred in connection with its lawsuit against TCH;

o.    Defendants defrauded the General Partner into authorizing improper costs and change orders; and

p.    Defendants have conspired with each other and aided and abetted each other's tortious interference, fraud, and other wrongful conduct, and Defendants are thus jointly and severally liable for all of Plaintiffs damages, including Plaintiffs' attorneys' fees, costs, and expenses.

q.    Plaintiffs are entitled to pre-judgment interest in an amount to be determined in connection with any future monetary judgment.

## <u>JURY DEMAND</u>

Plaintiffs respectfully demand a jury trial on all issues so triable.

Dated: September 26, 2025

Respectfully submitted,


/s/ S. Mark Mitchell
S. MARK MITCHELL
Ga. Bar No. 513463
LAW OFFICE OF
S. MARK MITCHELL, LLC
37 Calumet Parkway
Building N, Suite 118
Newnan, GA 30263
(770) 800-2327
mark@smmitchelllaw.com
LOCAL COUNSEL


/s/ C. Brian Jarrard
C. Brian Jarrard
Ga. Bar No. 389497
JARRARD LAW GROUP, LLC
4108 Arkwright Road, Suite 2
Macon, GA 31210
T: (478) 477-0004
brian@jarrardlawgroup.com


David A. Davenport (*pro hac vice* to be filed)
Alexander M. Hagstrom (*pro hac vice* to be filed)
BC DAVENPORT, PLLC
105 5th Avenue South, Suite 375
Minneapolis, MN 55401
T: (612) 445-8010
david@bcdavenport.com
alex@bcdavenport.com


ATTORNEYS FOR PLAINTIFFS